## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BON CONSULTING, INC. and | ) | |
| BON GROUP, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| BULLHORN, INC. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Bon Consulting, Inc. and Bon Group, Inc. (together, "Bon" or "Plaintiffs"), by their attorneys Epstein Becker & Green, P.C., bring this action against Defendant Bullhorn, Inc. ("Bullhorn") for damages and states as follows:

## NATURE OF THIS ACTION

1.      This is an action for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, negligence, gross negligence, conversion, tortious interference with prospective business relations, and unfair and deceptive trade practices arising out of Bullhorn's hasty, inexplicable, and debilitating deletion of Bon's business data housed in Bullhorn's cloud-based applicant tracking software ("ATS") and customer relationship management ("CRM") systems.

2.      Plaintiffs Bon Group, Inc. and Bon Consulting Inc. are collectively and solely owned and operated by a solo entrepreneur, Richard Glacken, and function together to contract with vendors and deliver information technology and business management consulting solutions to end-clients.

3.     To accomplish its mission, Bon relies entirely on its Applicant Tracking and CRM database ("Database") – its core business asset and lifeblood – for acquiring and servicing clients, fulfilling projects, and attracting and retaining its own internal workforce.

4.     In May 2021, without warning, Bullhorn wiped out nearly 40 years of sweat equity and legwork and set Bon back to square one, causing Bon millions of dollars in lost business and erasing the tens of millions of dollars that had been invested in the Database over the years in connection with Bon's tremendous efforts directed towards acquiring the client data and resumes in the Database Bullhorn was entrusted with hosting for Bon. Bullhorn took this step despite the fact that Bon had already satisfied the singular outstanding invoice that was owed to Bullhorn months earlier, on March 3, 2021.

5.     Bullhorn's failures not only violated the terms of the parties' contract, but breached duties extending beyond the contract. While Bullhorn will invoke a "limitation of liability" to reduce the fallout from its bad acts, no such limitation is enforceable where Bullhorn knowingly and willfully deceived Bon, misrepresented Bullhorn's abilities and intentions, and callously disregarded Bon's property rights and viability as a successful business.

6.     Bullhorn was entrusted with Bon's livelihood and as such, had duties to protect Bon's interests and exercise reasonable care. Despite these obligations, Bullhorn elected to destroy Bon's property, including proprietary data essential to Bon's business gathered over decades.

7.     In addition to causing physical stress and emotional distress to Bon's owner, Richard Glacken, Bullhorn's egregious misconducted inflicted irreparable damage to Bon at the height of the COVID-19 pandemic. Bullhorn's reckless misstep at this uncertain and pivotal juncture compounded and exacerbated the negative effects of the global pandemic on Bon's

operations, decimated Bon's ability to get back to its level of prior success, and prevented Mr. Glacken from emerging from the pandemic with his business intact.

## PARTIES

8.  Bon Consulting, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 10 Kings Road, Suite 102, Madison New Jersey 07940.

9.  Bon Group, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 10 Kings Road, Suite 102, Madison New Jersey 07940.

10.  Bon Group, Inc. and Bon Consulting, Inc. work together in a symbiotic fashion, coordinating and managing revenues, costs, and expenses.

11.  Bullhorn, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 100 Summer Street, 17th Floor, Boston, Massachusetts 02110.

## JURISDICTION AND VENUE

12.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the Parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.  This Court has personal jurisdiction over the defendant because, among other things, the defendant resides and regularly transacts business in this judicial District.

14.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred within this District and defendants reside and regularly transact business in this District.

## FACTUAL BACKGROUND

### I.    Bon Builds its Repository of Consultant Data

15.    Bon's predecessor entity, Bon Consulting Group, Inc., was formed in 1982 by a solo entrepreneur and began delivering information technology ("IT") and business management consulting services to clients.

16.    Today, and for nearly 40 years, Bon focuses on providing companies with IT project teams, individual technology and business management consultants as well as full time personnel to accomplish client specific business and technology initiatives.

17.    For fulfilling client requirements, Bon mostly relies on its extensive CRM database of "up to date" client-specific proprietary technology data and contacts and its ATS repository for resumes and contact information of Technology and Business Management professionals, as well as its industry experience and expertise.

18.    Bon spent decades building and refining its Database of professionals and companies, collecting key data over time and continuing to cleanse and distill its data, with further enhancing with its own proprietary information to optimize its business solutions.

19.    Within its Database, Bon collected and hosted contractors' resumes, rates, salaries, contact information, and experience notes, as well as company profiles with reporting structures, infrastructure specifications, project history and expectations, and technological plans.

20.    This information in the Database about specific contractors Bon could engage for clients, as well as company profiles detailing a specific client's needs, was gathered and refined across decades of diligent pursuit, enhancement, and fine-tuning and gave Bon a unique advantage to efficiently and effectively identify and deliver vetted and qualified professionals.

21.    The depth, detail, and history of Bon's Database, paired with the proprietary information embedded within the data for purposes of pairing the best-suited professionals with

available client projects, allowed Bon to offer more precise and efficient services, differentiating it from its competitors.

## II.     Bon Engages Bullhorn to Host its Database

22.     From 1982 until 2010, Bon used and hosted several CRM/ATS solutions and backed up its data cataloging its Database of IT consultants and company profiles on internal servers and backed up at its own facilities.

23.     Richard Glacken had already been operating independently in the Technology industry and began working with Bon in 2002.

24.     The two companies joined forces and worked together, with the goal that Mr. Glacken would buy out the current owner. When Mr. Glacken's purchase of Bon was complete in 2009, Bon began researching High Availability and redundant "cloud-based" ATS/CRM solutions for Bon's next-generation software storage needs.

25.     Given the essential role its ATS and CRM data played in Bon's ability to render services, high availability, data preservation, privacy and security were Bon's paramount considerations for its data storage solutions.

26.     After multiple demonstrations with various ATS/CRM data hosting vendors, Bon selected Bullhorn to provide its cloud storage services beginning in 2010 based on Bullhorn's technical specifications, reputation in the industry, and specific assurances about data backup and safety.

27.     Bullhorn is in the business of providing database hosting services and was a leading staffing software vendor in the market at the time, and provided express assurances and reassurances to Bon on numerous occasions that Bullhorn's data security practices were best-in-class and compliant with accepted accessibility standards.

28.     Because Bullhorn hosts its customers' most valuable information, it owes a duty to safely store and backup its customers' data, and to avoid irretrievably deleting sole extant databases without providing a copy or backup, or opportunity to obtain a copy or backup, before deleting.

29.     Crucially, in order to assuage Bon's apprehension about hosting and backing up its inimitable data offsite, a concern that Bullhorn was expressly aware of, the essential value of the Database, as well as the importance of the distinctive proprietary information embedded within the Database, Bullhorn, via its sales representative assigned to manage Bon's account, Josh Logan, among others on Bullhorn's team, represented to Bon that its data would be retrievable in even the most cataclysmic circumstances. For example, were Bullhorn to host Bon's Database, Bullhorn promised to allow for mirroring and data replication to other servers in its global ecosystem in order to maintain high availability, and to regularly construct physical tape backups of their customer's data and store these tapes in a fireproof room.

30.     Bullhorn's sales representative further promised that, in the event the parties' terminated their contract for any reason, Bon was assured that the final, most recent version of its entire Database would be shared via secure file transfer protocol server once Bon's final balance was paid-in-full. Put simply, Bullhorn guaranteed to Bon that, no matter what, Bon's Database was secure and would be available to Bon under any circumstance.

31.     Even today, Bullhorn publicly touts its data loss prevention and recovery capabilities, ensuring its current and potential customers will benefit from secure features supporting business continuity.[1]

---

[1] *See* https://www.bullhorn.com/gdpr-commitment-statement/ (last accessed May 16, 2024).

32.     In reliance on these representations, Bon, via Bon Group, Inc.,[2] entered into the Master Subscription Agreement (the "Agreement") effective on or about July 27, 2010, and Bon migrated its entire Database, including all of its historical CRM/ATS and business data, dating back as far as 1982, to Bullhorn's High Availability Cloud CRM/ATS Solution.[3]

33.     In exchange for Bon paying fees, Bullhorn was the sole repository for all of the data Bon required to conduct its business, and was entrusted with safeguarding Bon's entire Database and technical and intellectual property dating back to 1982.

34.     For approximately 10 years, the parties' relationship proceeded without notable incident. Although there were technical glitches from time to time where records failed to save, or in some cases would disappear and reappear without warning or explanation, and technical support "tickets" that remained unresolved for months on end, Bon never considered a possibility where its data was at any risk in Bullhorn's hands. Based on Bullhorn's assurances and practices, Bon trusted that its Database was retrievable under any circumstances Despite these occasional glitches, Bon remained a loyal and dedicated customer.

35.     Bon's ever-growing and improving Database fostered Bon's growth and improved functionality and efficiency. The continued growth and refinement of Bon's Database ultimately resulted in Bon achieving higher revenue from a smaller internal team with lower costs, thereby increasing profitability.

---

[2] Bon Group, Inc. manages paying administrative and all expenses associated with both Bon Group, Inc. and Bon Consulting, Inc. Bon Consulting, Inc. manages receiving payment from clients. Both entities rely on the Database for carrying on their business operations and generating the entities' revenue.

[3] A copy of the 2010 Agreement is submitted here as **Exhibit A**.

36.     The Agreement, which was renewed in 2014 and thereafter subject to automatic annual renewal, required Bullhorn to maintain Bon's data in an accessible, secure, and redundant fashion for the duration of the Agreement and for some time thereafter.[4]

37.     Section 3a of the Terms and Conditions of the Agreement states that: "[a]ll Customer Data Submitted by Customer to Bullhorn. . . will remain the sole property of Customer . . . to the full extent provided by law."

38.     Section 3b of the Terms and Conditions provides: "On no less than a monthly basis during the Term, Bullhorn will (at Customer's request in writing or by email to Bullhorn Customer Support) make one ODBC compliant backup of the then current Customer Data available to the Customer via FTP server."[5]

39.     The parties' Agreement was also subject to Bullhorn's Terms of Service, which stipulates Bullhorn's remedies in the event of non-payment, and provides at Section 7.1: "Bullhorn reserves the right to suspend and/or terminate Customer's access to the Service and/or terminate the Agreement, and/or withhold Customer Support and Professional Services, upon 5 days' email notice, if Customer's account becomes delinquent (falls into arrears)."[6]

40.     Relatedly, Section 7.4 of the Terms of Service provides: "[I]n the event that the Agreement is terminated (for any reason), Bullhorn will make available one . . . backup of the Customer Data. Customer agrees and acknowledges that Bullhorn has no obligation to retain the Customer Data, and may delete such Customer Data that remains more than 60 days after termination."

---

[4] A copy of the 2014 Amendment is submitted here as **Exhibit B**.
[5] ODBC is short for Open DataBase Connectivity. It is a standard database access method, the goal of which is to make it possible to access any data from any application, regardless of which database management system is handling the data.
[6] A copy of the Terms of Service is submitted here as **Exhibit C**.

### III.    Bullhorn Improperly Wipes Out All Traces of Bon's Data

41.     In 2020, the COVID-19 pandemic sent Bon's business into a tailspin; staffing and projects at clients were put on hold and the IT staffing and consulting industry went largely dormant. Bon was forced to regroup and restrategize.

42.     Hoping for collaboration from its long-time data-hosting partner on a path forward and navigating COVID relief, Bon was instead faced with unresolved technical tickets and untimely and opaque communication from Bullhorn.

43.     On or about December 7, 2020, Bon received a "Notice of Pending Suspension" via automated email, stating that Bon's account would be suspended if an outstanding balance of $740.58 was not paid by December 14, 2020.

44.     The Notice of Pending Suspension made no mention of "termination" of the Agreement or deletion of Bon's Database, imminent or otherwise.[7]

45.     On March 3, 2021, Richard Glacken of Bon contacted Bullhorn about activating the suspended account and paid off the entire balance of $740.58 Bon owed to Bullhorn.

46.     On March 4, 2021, Bridget Hickey of Bullhorn, Bon's former account manager dating back to 2018, replied to Richard Glacken's inquiry with enthusiasm and eager to help. Ms. Hickey stated that "your database should still be accessible…"

47.     In fact, as of March 4, 2021, Bon's invaluable Database *was* still accessible.

48.     On or about May 7, 2021, Bullhorn inexplicably deleted Bon's entire Database, all copies, backups, and redundancies without any notice to Bon. Bullhorn took this measure despite knowing that Bon was actively requesting access to its Database, that Bon had paid its entire balance owed to Bullhorn, and despite the fact that the Agreement and all Terms were in full force

---

[7] A copy of the Notice of Pending Suspension email is submitted here as **Exhibit D**.

and effect and despite the fact that the account had previously been suspended but never terminated.

49.     On information and belief, Bullhorn located and destroyed the sole extant physical copy backup of Bon's database Bullhorn assured would be safeguarded in a fireproof room.

50.     On or about May 17, 2021, having no idea that Bon's data and backups had been deleted, Richard Glacken contacted Ms. Hickey requesting a phone call to discuss accessing Bon's data. That same day, Ms. Hickey responded, noting that she needed to check on the status of Bon's billing, account, and Database.

51.     Ms. Hickey's expectation that Bon's database to be accessible was reasonable because Bon's Database _should_ have been accessible, both under the express terms of the parties' Agreement as well as Bullhorn's representations to Bon about the fully secure, redundant, and certainly retrievable nature of Bullhorn's data storage systems – the same representations Bon relied upon when entrusting Bullhorn with the security of its entire business.

52.     Neither Bon's Agreement nor its account with Bullhorn had ever been terminated.

53.     Bon was never contacted about the possibility its Database was about to be deleted.

54.     Despite the express terms of the Agreement and Bullhorn's representations to Bon, Bon was never offered the opportunity to obtain a copy or backup of its Database.

55.     On or about May 18, 2021, Ms. Hickey confirmed to Richard Glacken that Bon's account had been "settled up" with "no outstanding balance," and indicated, for the very first time, that Bon's Database had been "deleted due to inactivity," although this measure is not provided for, permitted, or contemplated by the parties' Agreement.

56.      Ms. Hickey offered the possibility that the Database may be retrievable. Ms. Hickey went on to state that, "[t]ypically, Bullhorn will disable and delete a database within 30-

60 days of cancelation or termination of contract. While your database was live in March, it had been disabled shortly thereafter."

57.     At some point thereafter, Bullhorn informed Bon that its Database was irretrievably deleted.

58.     Nearly 40 years of time, work, investment, and sweat equity had been erased in a few keystrokes, without warning, even though Bullhorn was aware of Bon's contractual and property rights to access copies of its data, as well as Bullhorn's actual knowledge that Bon was attempting to "rebuild" its business, and needed that Database to do so.

59.     On or about June 14, 2021, John Nikula of Bullhorn acknowledged to Richard Glacken that "[i]t's a very difficult situation…"

60.     Rich Glacken replied to the belittling and minimizing nature of Nikula's comment, succinctly summing up the impact of Bullhorn's shortsighted dismantling of Bon's business: "This is beyond being a difficult situation by a magnitude of 10. . . . Losing the database kills the business."

## COUNT I
### (Breach of Contract)

61.     Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

62.     Bullhorn entered into the Agreement, as amended, with Bon in which Bullhorn guaranteed, pursuant to Section 3b of the Terms and Conditions and Section 7.4 of the Terms of Service to make available copies or backups of Bon's data.

63.     The Agreement is a valid, binding, and enforceable contract between Bon Group, Inc. and Bullhorn, entered into for the benefit of both Bon Group, Inc. and Bon Consulting, Inc.'s

business operations, as both entities rely on the Database for conducting business and generating revenue.

64.     The Agreement was not terminated prior to May 18, 2021. To date, Bullhorn has never sent any communication to Bon indicating that the Agreement has been terminated.

65.     Bon performed all of its obligations under the Agreement, and as of March 3, 2021, had paid all amounts owed to Bullhorn, thus entitling Bon to have access to its database and/or a copy thereof.

66.     At all relevant times beginning July 27, 2010, Bullhorn was bound by the terms of the Agreement, specifically its obligations to maintain Bon's data in secure, retrievable, redundant fashion, with the ability of producing a copy to Bon, and certainly, to refrain from deleting Bon's database without first providing notice of termination and an opportunity to obtain a copy of the database.

67.     Bullhorn materially breached the Agreement when Bullhorn permanently deleted Bon's data despite the fact that Bon paid all amounts owed to Bullhorn two months before Bullhorn deleted their data, without ever having terminated the Agreement.

68.     Bullhorn materially breached the Agreement by failing to create and preserve a backup copy of Bon's Database despite Bon expressly requesting the creation of such a backup.

69.     As a direct and proximate result of Bullhorn's breaches, Bon has suffered damages in an amount to be determined at trial, including, without limitation, the amount of lost revenue, lost sales, loss of reputation, and loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

## COUNT II
### (Breach of Fiduciary Duty)

70.     Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

71.     Bullhorn and Bon had a special relationship by virtue of Bon placing its trust and confidence in Bullhorn's judgment and integrity in maintaining and protecting Bon's Database, which Bon required to survive as a business.

72.     Bullhorn was a leading staffing software vendor in the market at the time and provided express assurances and reassurances to Bon on numerous occasions that Bullhorn's data security practices were best-in-class and compliant with accepted accessibility standards, and Bon relied on this experience, expertise, and assurances for relinquishing control of its Database to Bullhorn's control.

73.     By hosting Bon's critical Database, given the critical import of the Database to Bon's business, Bullhorn accepted this position of trust.

74.     In light of the special relationship between Bullhorn and Bon, whereby Bullhorn became a guardian of Bon's Database, Bullhorn became a fiduciary by its hosting and guardianship of the Database, to act in the best interest of Bon for the safeguarding of the Database, to timely notify Bon that the Database may be deleted, to provide Bon the opportunity to obtain a backup or copy of the Database, and to maintain a copy or backup of Bon's database.

75.     Bullhorn had a fiduciary duty to act for the benefit of Bon upon matters within the scope of this relationship, in particular, to keep secure, available, and redundant copies of the Database.

76.    Bullhorn breached its fiduciary duties to Bon by failing to adequately preserve Bon's access to a copy or backup of its Database and provide an opportunity for Bon to obtain a copy or backup of its Database.

77.    Bullhorn breached its fiduciary duties owed to Bon by failing to provide an adequate warning that Bon's Database would be deleted.

78.    Bullhorn breached its fiduciary duties owed to Bon by permanently deleting Bon's Database despite Bon paying off its balance owed to Bullhorn.

79.    Bullhorn breached its fiduciary duties owed to Bon by permanently deleting Bon's Database despite not terminating the Agreement or Bon's account.

80.    As a direct and proximate result of Bullhorn's breach of its fiduciary duties, Bon has suffered and will suffer injury, including but not limited to lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

81.    As a direct and proximate result of Bullhorn's breaches of its fiduciary duties, Bon has suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### COUNT III
### (Fraudulent Misrepresentation)

82.    Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

83.    In connection with the Agreement, Bullhorn made false representations of fact to Bon. These false representations included ensuring that a copy or backup of Bon's Database would be available or otherwise retrievable, and or that Bon would have an opportunity to obtain a copy or backup of the Database in the event the Agreement was terminated, knowing that Bon was only

willing to enter into the Agreement with assurances that its only extant copy of its Database would be secure, accessible, or otherwise retrievable.

84.     Bullhorn knew that the above representations were false when made or made these representations with a reckless indifference to the truth of the assertions made.

85.     Bullhorn made the above representations with the intent to induce Bon into entering into and maintaining the Agreement, and to induce Bon to entrust its entire Database to Bullhorn.

86.     Bon entered into the Agreement in justifiable reliance on Bullhorn's assurances that its Database would be secure, backed up, and available in cloud-based and physical formats, as Bullhorn was in the business of hosting databases and was in the best position to know Bullhorn's capabilities, policies, and practices for preventing irretrievable loss of the Database.

87.     As a result of Bon's justifiable reliance on Bullhorn's misrepresentations, Bon was damaged in an amount to be determined at trial for damages including but not limited to lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

### <u>COUNT IV</u>
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

88.     Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

89.     Bon entered into an Agreement with Bullhorn. The Agreement binds Bullhorn.

90.     Good faith is an element of every contract.

91.     All contracts impose upon each party a duty of good faith and fair dealing.

92.     Bullhorn is obligated to comply with the substance of Agreement in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

93.     The material terms of the Agreement therefore included the implied covenant of good faith and fair dealing, whereby Bullhorn covenanted that it would, in good faith and in the exercise of fair dealing, deal with Bon fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Bon's property, rights, existing customer or employee relationships, or prospective business relationships.

94.     Bon paid all amounts owed to Bullhorn and otherwise performed all conditions, covenants, and promises in accordance with the terms and conditions of the Agreement.

95.     Bullhorn has breached the implied covenant of good faith and fair dealing in the Subcontract by:

    a.  Deleting Bon's Database despite knowing the importance of the Database to Bon's success, viability, and survival as a business;

    b.  Deleting Bon's Database without providing advance notice or warning the Database would be imminently, permanently, and irretrievably deleted;

    c.  Deleting Bon's Database without providing Bon with the opportunity to obtain a copy or backup of the Database.

96.     As a proximate result of Bullhorn's breach of the implied covenant of good faith and fair dealing, Bon has been damaged in an amount to be proven at trial, including, without limitation, the loss of Bon's business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

## <u>COUNT V</u>
### (Negligence)

97.     Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

98.     Bon entrusted their Database to Bullhorn.

99.     Given the nature of Bon's business, Bullhorn knew or should have known that Bon's viability as a business relied, imperatively, on its Database, including the accessibility and security thereof.

100.    Bullhorn owed to Bon a duty to exercise reasonable care in handling and maintaining the Database in its care, custody, and sole including implementing standard backup and notice procedures sufficient to reasonably alert Bon that its Database may be deleted, and offer Bon the opportunity to obtain a copy or backup of its Database before the Database was permanently and irretrievably deleted.

101.    Bullhorn owed a duty of care to Bon because it was foreseeable that Bullhorn's failure to adequately back up and save Bon's Database, provide access to the Database, and refrain from permanently and irretrievably deleting the Database without warning or providing Bon an opportunity to obtain a backup or copy of the Database, its deletion of Bon's Database would result in the loss of Bon's business.

102.    Bullhorn acted with wanton and reckless disregard for the security and availability of Bon's and survival of Bon's business by deleting the Database without providing Bon the opportunity to retain a copy or backup. Bullhorn had a duty to employ reasonable data security and preservation measures.

103.    Bullhorn owed to Bon a duty to provide adequate warning and notice that the Database may be permanently and irretrievably deleted with a reasonable opportunity to permit Bon to obtain a copy or backup.

104.    Bullhorn owed these duties to Bon and because it was foreseeable and probable that Bon would suffer injury from Bullhorn's failure to preserve access or backup copies of the Database. Bullhorn knew or should have known Bon would suffer injury-in-fact from Bullhorn's failure to preserve access or backup copies of the Database.

105.    Bullhorn breached its duties by failing to exercise reasonable care in ensuring availability of copies or a backup of Bon's Database, warning Bon that the Database may be permanently deleted, and/or offering Bon a reasonable opportunity to obtain a copy or backup of its Database, which actually and proximately caused harm suffered by Bon due to the nature of Bon's business that relied on access to its Database for its viability and survival.

106.    Bullhorn breached its duty by failing to provide adequate warning and notice that the Database may be permanently and irretrievably deleted with a reasonable opportunity to permit Bon to obtain a copy or backup.

107.    As a direct and proximate result of Bullhorn's negligence, Bon has suffered and will continue to suffer damages, including monetary damages, reputational harm, and loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

108.    But-for Bullhorn's wrongful and negligent breach of duties owed to Bon, Bon would not have permanently lost its Database and suffered damages.

109.    Bullhorn's breach of its duties to exercise reasonable care and its failures and negligence actually and proximately caused Bon actual, tangible, injury-in-fact and damages, including, without limitation, the loss of the information Bon required to conduct its business.

**COUNT VI**
**(Gross Negligence)**

110.    Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

111.    As of May 7, 2021, Bullhorn was in exclusive custody of Bon's proprietary Database and owed a duty to keep its Database secure, copied, backed up, redundant, and provide Bon the opportunity to obtain a copy or backup of its Database before permanently deleting it, and reasonably ensure Bon could access its database.

112.    Bullhorn owed Bon a duty of reasonably ensuring that the Database was not deleted while Bon did not owe a balance or before the Agreement had been terminated, and reasonably providing notice and an opportunity to obtain a copy or backup before permanently deleting Bon's Database.

113.    Bullhorn breached its duty to keep Bon's Database secure and available by wantonly, willfully, and/or recklessly accessing the Bullhorn server being used to store Bon's Database and permanently deleting Bon's Database, and by deleting or destroying all backup copies, including physical tapes which Bon could use to retrieve or obtain access to its Database.

114.    Bullhorn knew Bon's Database was critical to Bon's success, viability, and survival as a business, as Bon earned all revenue in reliance on and by using the Database.

115.    Bullhorn deleted Bon's Database without prior notice or warning to Bon, without providing and opportunity to obtain a copy or backup or means of restoring or recreating the

Database, and despite Bon's Agreement with Bullhorn that had not been terminated, and despite Bon paying its account balance in full prior to deleting the Database.

116.    Bullhorn's destruction of the Database and all copies and backups, which it knew to be valuable and critical to Bon's business, despite the Agreement and without notice or opportunity obtain a backup copy of the Database constitutes and extreme departure from the ordinary standard of conduct for a data hosting company under the circumstances.

117.    As a direct and proximate result of Bullhorn's grossly negligent conduct, Bon's Database was permanently deleted.

118.    Bullhorn's extreme departure from its standard of care actually and proximately caused Bon actual, tangible, injury-in-fact and damages, including, without limitation, the loss of the information Bon required to conduct its business.

119.    As a direct and proximate result of Bullhorn's extreme departure from its standard of care, Bon has suffered and will suffer injury, including but not limited to lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

120.    As a direct and proximate result of Bullhorn's extreme departure from its standard of care, Bon has suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VII
### (Conversion)

121.    Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

122.    At all relevant times, Bon was the owner with the right to possession of, and was and still is entitled to possession of, the Database of consultant, company, and proprietary information that was hosted by Bullhorn and in Bullhorn's possession and control.

123.    On or about May 7, 2021, Bullhorn converted Bon's Database by willfully and with conscious disregard for Bon's rights, permanently and irretrievably deleting Bon's Database and destroying all extant physical copies of the Database, without first providing Bon the opportunity to obtain a copy or backup, and without authorization or justification,

124.    As a direct and proximate a result of Bullhorn's conversion, Bon is entitled to recover the value of its Database and fair compensation for the time and money expended to create the Database.

## COUNT VIII
### (Tortious Interference with Advantageous Business Relations)

125.    Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

126.    At all material times, Bon had a reasonable expectation of advantageous business relations with prospective customers.

127.    At all material times, Bon had a reasonable expectation that Bullhorn would abide by all terms of the Agreement, including ensuring the security and availability of its Database, which Bon relied on to acquire and service customers.

128.    At all material times, Bullhorn had actual knowledge and notice of Bon's foregoing reasonable expectation of economic advantage.

129.    By deleting Bon's Database after misrepresenting that a copy or backup would be available, and/or that Bon would be provided the opportunity to obtain a copy or backup, and/or that a physical copy of Bon's Database would be preserved and retrievable form a fire-proof room,

Bullhorn used improper means to interfere with Bon's actual and prospective advantageous business relations.

130.    As a direct result of Bullhorn's interference, Bon's actual and prospective business relationships have been damaged or destroyed, as Bon would have been able to attract and service more clients and attract professional staff but for Bullhorn's interference.

131.    Consequently, Bon has suffered and continues to suffer substantial damages and irreparable harm in an amount to be proven at trial, including, without limitation, lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

### COUNT IX
### (Violation of M. G. L. C. 93A, §§ 2, 11)

132.    Bon restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

133.    Bon is a "person" and engages in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

134.    Bullhorn is a "person" and engaged in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

135.    The actions of Bullhorn as set forth above constitute willful and knowing violations of M. G. L. c. 93A, §11, and they have occurred primarily and substantially within Massachusetts.

136.    Bullhorn's wrongful practices include, without limitation, deleting Bon's critical and valuable Database, without notice, and without offering Bon the opportunity to obtain a copy or backup, despite knowing Bon required access to its Database for its success, survival, and viability, despite Bon paying its account in full, despite the Agreement, and despite Bullhorn's express assurances that Bon would have access to copies or backups of its Database.

137.    As a direct and proximate result of Bullhorn's actions, Bon has suffered damages in an amount to be proven at trial, including, without limitation, lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business.

## PRAYER FOR RELIEF

WHEREFORE, Bon respectfully requests the following relief:

a)  Compensatory damages in an amount to be proved at trial in excess of the exclusive jurisdictional minimum, including, without limitation, lost profits, lost business, lost revenue, loss of reputation, loss of goodwill, future costs in terms of time, effort, and money that will be expended as result of losing the Database, and the diminished value of Bon's business;

b)  Conversion damages in the amount of the value of its Database and fair compensation for the time and money expended to create the Database;

c)  Multiple damages and attorneys' fees to Bon pursuant Mass. Gen. L. c. 93A;

d)  Costs and expenses otherwise recoverable under the law;

e)  Pre-and post-judgment interest at the highest legal rate; and

f)  Any other relief as deemed to be warranted by this Court.


Respectfully,

BON CONSULTING, INC. and BON GROUP, INC.

*/s/ Erik W. Weibust*
Erik W. Weibust (BBO # 663270)
Adam R.D. Paine (BBO # 697246)
Epstein Becker & Green, P.C.
125 High Street, Suite 2114
Boston, Massachusetts 02110
Tel: (617) 603-1100
eweibust@ebglaw.com
apaine@ebglaw.com

Dated May 17, 2024            *Attorneys for Plaintiffs Bon Consulting. Inc. and Bon Group, Inc.*